IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICKY J. SAMPSON,

    Plaintiff,

      v.

KASIM REED
in his official capacity as Mayor of the
City of Atlanta, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:12-CV-500-TWT

## ORDER

    This is a civil rights action.  It is before the Court on Defendants Kasim Reed, Robert Godwin, and Reginald Pettis's Motion for Summary Judgment [Doc. 37] and on Defendants Kasim Reed, Robert Godwin, and Reginald Pettis's Motion to Strike Unauthenticated Documents Used by Plaintiff in Defense Against Defendants' Motion for Summary Judgment [Doc. 55].  For the reasons set forth below, the Defendants' Motion for Summary Judgment [Doc. 37] is GRANTED in PART and DENIED in PART and the Defendants' Motion to Strike Unauthenticated Documents Used by Plaintiff in Defense Against Defendants' Motion for Summary Judgment [Doc. 55] is DENIED as MOOT.

T:\ORDERS\12\Sampson\msjtwt.wpd

## I.  <u>Background</u>

Plaintiff Ricky Sampson alleges he was strip searched on February 17, 2010, outside the West End Mall in Atlanta, Georgia by a unit of the Atlanta Police Department ("APD") known as the "Red Dogs."  The Plaintiff alleges that Defendant Reginald Pettis, a member of the Red Dog unit, grabbed the Plaintiff's arm and then strip searched the Plaintiff in the parking lot of the Georgia Power building. According to the Plaintiff, Pettis pulled down the Plaintiff's pants and underwear and searched around the Plaintiff's genitals and buttocks area.  Accompanying Defendant Pettis were Defendants Godwin and Mayes, as well as Defendant Amarena. Defendant Godwin stood by the police vehicle during the strip search and did nothing to intervene.  Amarena and Mayes held the Plaintiff's arms while Pettis performed the search.  (<u>See</u>  Statement of Disputed Material Facts in Opp'n to Defs.' Mot. for Summ. J. ¶¶ 1-26).  Defendants Godwin and Pettis contend they were not present at the West End Mall area on February 17, 2010, and further contend that they did not perform a search of or have any physical contact with the Plaintiff on that day. (<u>Compare</u> Statement of Disputed Material Facts in Opp'n to Defs.' Mot. for Summ. J. ¶¶ 1-13 <u>with</u> Defs.' Resp. to Pl.'s Statement of Disputed Material Facts in Opp'n to Defs.' Mot. for Summ. J. ¶¶ 1-13).

The Plaintiff further alleges that the APD and the Red Dog unit in particular had a custom, policy, or practice of performing strip searches in public.  The Plaintiff contends that Red Dog unit supervisors encouraged unit members to always check a suspect's underwear.  The aggressive searching policy was purportedly part of the Red Dog's efforts to make their presence known in high crime areas of the city. (Statement of Disputed Material Facts in Opp'n to Defs.' Mot. for Summ. J. at ¶¶ 47-52).  The Plaintiff contends this policy was authorized by Standard Operating Procedures 3080, § 4.11.2.  The Plaintiff further states that APD supervisors, including the Chief of Police, condoned the practice.  (Id. at ¶¶ 30-35).  The Plaintiff notes that the Atlanta Citizen Review Board ("ACRB") recommended the discipline and training of several officers regarding the strip searches and searches and seizures generally in 2009.  (Id. at ¶¶ 36-39).  The Plaintiff also alleges there have been numerous citizen complaints since 2007 concerning strip searching.  (Id. at ¶¶ 40-41).

The Plaintiff filed this action on February 16, 2012.  His complaint asserts claims for unreasonable search and seizure under the United States Constitution, false imprisonment, abuse in being arrested, and battery, as well as claims for punitive damages and for fees and expenses.  The Plaintiff initially brought claims against

Mayor Kasim Reed in his official capacity, and APD Officers Cayenne Mayes,[1] Robert Godwin, Reginald Pettis, Stalone Davis, and Luca Amarena, in their individual capacities. (See Compl. ¶¶ 4-9). The Plaintiff has since dismissed the claims against Officers Stalone Davis and Luca Amarena. (See [Doc. 62, 70]). Defendant Cayenne Mayes initially defaulted, but his default was set aside on January 30, 2013. (See [Doc. 56, 57]). Defendants Reed, Godwin, and Pettis filed the pending motion for summary judgment.

## II. Motion for Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond

---

[1]Defendant Cayenne Mayes was discharged from the APD on July 22, 2011. (Mayes Decl. ¶ 2).

the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

### III.  Discussion

The Defendants move for summary judgment on several grounds.  First, they contend that the suit against Atlanta Mayor Kasim Reed is a suit against the City of Atlanta which must be dismissed because the Plaintiff has not shown that his constitutional rights were violated pursuant to an official policy or custom of the city. Second, the Defendants contend that Defendants Pettis and Godwin are entitled to qualified immunity because they acted in their discretionary capacity and did not violate the Plaintiff's constitutional rights.  Third, the Defendants argue that the state law claims against Pettis and Godwin must be dismissed because no evidence exists that Pettis or Godwin searched, seized, or arrested the Plaintiff and because Godwin and Pettis are entitled to official immunity.  Finally, the Defendants contend the Plaintiff's claims for punitive damages and for costs of litigation must be dismissed because the underlying state tort claims should also be dismissed.

### A.  Claims Against Mayor Reed and the City of Atlanta

The Plaintiff's claims against Mayor Reed in his official capacity as Mayor of Atlanta are construed as claims against the City of Atlanta.  See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (quoting Monell v. New York City Dept. of Social

Services, 436 U.S. 658, 690 n.55 (1978)) ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"). Municipal entities, such as the City of Atlanta, are liable only for constitutional violations arising from an official policy or custom. City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). A "policy" in this context is "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (quoting Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479-80 (11th Cir. 1991)). "A custom is a practice that is so settled and permanent that it takes on the force of law." Id. (quoting Monell, 436 U.S. at 690-91).

Here, the Plaintiff has not shown that there was a City of Atlanta policy directing APD officers to perform illegal strip searches. The Plaintiff provides evidence that the Red Dog units were instructed to conduct strip searches of as many suspects as possible. (See Mayes Decl. ¶ 7). However, these instructions from the supervisors of a unit within the APD do not reveal a policy "created by an official of such rank that he or she could be said to be acting on behalf of the [City of Atlanta]." See Sewell, 117 F.3d at 489 (quoting Brown, 923 F.2d at 1479-80). Likewise, the Plaintiff states that the practice of strip searching was not stopped by the Chief of Police until the end of 2011 despite evidence that he was aware of it before then.

Even assuming the chief was aware of the strip searches,  this does not indicate that there was a policy *created* or *adopted* by a municipal official.  See id.  Additionally, the Plaintiff states that the strip search policy was embodied in Standard Operating Procedure 3080, § 4.11.2.  (See Mayes Decl. ¶¶ 16-17, Ex. 1).  But section 4.11.2 specifically states that a strip search of a suspect is only appropriate when there is reasonable suspicion following a lawful arrest or when the officer possesses a search warrant.  (See id. Ex. 1).  The Plaintiff has not shown there was a policy in the City of Atlanta directing APD officers to perform strip searches.[2]

The Plaintiff separately argues that the City of Atlanta had a custom of conducting illegal strip searches.  To establish a custom, "it is generally necessary to show a persistent and widespread practice.  Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the

---

[2]The Plaintiff also contends that the City of Atlanta ratified the strip search practice.  "For plaintiffs to state a successful § 1983 claim against a municipality based on a ratification theory, however, 'they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis.'" Garvie v. City of Fort Walton Beach, 366 F.3d 1186, 1189 (11th Cir. 2004) (quoting Thomas v. Roberts, 261 F.3d 1160, 1175 n.12 (11th Cir. 2001), *vacated on other grounds by*, 536 U.S. 953, *reinstated by*, 323 F.3d 950)).  The Plaintiff has not demonstrated that local policymakers agreed with the decisions of Red Dog officers to perform strip searches or had the opportunity to review such decisions.  Indeed, the Plaintiff's own evidence shows that, in 2011, the Chief of Police took action to stop the strip searching.  (See Beamud Decl. ¶ 18).  Accordingly, the Plaintiff has not shown that the City of Atlanta ratified the practice of performing strip searches.

municipality." <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1345 (11th Cir. 1994) (quoting <u>Depew v. City of St. Marys</u>, 787 F.2d 1496, 1499 (11th Cir. 1986)). Likewise, "[a] municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct." <u>Id.</u> (quoting <u>Brooks v. Scheib</u>, 813 F.2d 1191, 1193 (11th Cir. 1987)).

The Plaintiff argues that the ACRB investigated and concluded "there was indeed a pattern of conducting strip-searches and body-cavity searches, in the field which had begun at least as far back as 2007." (Beamud Decl. ¶ 11). The Plaintiff also notes that Red Dog officers would report their searches of suspects and that those reports were passed up the chain of command. (Mayes Decl. ¶ 6). Further, the Plaintiff argues that a series of lawsuits against the City of Atlanta before and after the alleged strip search of the Plaintiff served to notify the city of the searching custom.

This evidence is insufficient to show that the City of Atlanta had a custom encouraging APD officers to conduct strip searches. First, the Plaintiff states that the ACRB conducted an investigation and reported to the Chief of Police its conclusions that there was a pattern of strip searches. However, the declaration of Cristina Beamud, the director of the ACRB, does not indicate that the Chief of Police was

notified of the Red Dog Team's genital searching of suspects prior to the search of the Plaintiff.  According to the declaration, "[a]s a result of the troubling pattern of inappropriate searches, on July 14, 2009, the ACRB recommended that the Atlanta Police Department conduct training regarding Fourth Amendment issues including 'Terry stops' and proper procedures for searches.  The Chief of Police rejected this recommendation."  (Beamud Decl. ¶ 14).  There is nothing in this statement suggesting that the ACRB informed the Chief of Police of the Red Dog Team's practice of performing genital searches.  The statement only indicates that the ACRB recommended Fourth Amendment training.  Further, the Plaintiff has not produced a copy of the recommendation sent to the Chief of Police.  The Court will not assume that the chief was notified of a prevailing custom of conducting strip searches based on a statement in a declaration stating that the ACRB recommended further training.

Second, the fact that genital or underwear searches of various suspects were put in police reports that were passed up the chain-of-command for statistical reporting purposes does not evidence tacit approval of a policy of illegal searches.  The Plaintiff has not shown what form a report would take that makes its way up the chain of command, nor what information is contained in a report, nor that such a report would in fact reach a sufficiently high-ranking official.  Further, the Court will not assume that the command at the APD managed to synthesize all of the alleged reports of strip

searches to learn that the department was consistently engaging in illegal searches and then approving them by failing to stop them.  This is too great an inference at the summary judgment stage.

Third, the Plaintiff identifies the ACRB investigations that culminated in a 2011 report concluding that APD officers were "unfamiliar with the constitutional requirements for conducting a search and/or seizure." (Beamud Decl. ¶ 16).  Director Beamud met with the Chief of Police and the Mayor's Chief of Operations in 2011 to discuss the issue.  Later, in November 2011, Beamud sent the Chief of Police, the Mayor, and the City Council letters explaining the pattern of misconduct by Red Dog officers.  (Id. ¶¶ 17-18).  Even assuming that these notifications from the ACRB were sufficient to provide knowledge to the upper management of the APD of the strip search policy, they were not sent before the February 2010 search of the Plaintiff.  Because the Plaintiff's constitutional rights must have been violated "pursuant to a custom," and because a custom requires the knowledge and tacit approval of the management, this disclosure was too late to affect the Plaintiff's claims.  See Harris, 489 U.S. at 385.

Lastly, the lawsuits filed against the City of Atlanta do not help the Plaintiff show a custom of performing strip searches.  Only one of the lawsuits concerned an incident that occurred prior to the search of the Plaintiff.  (See Statement of Disputed

Material Facts in Opp'n to Defs.' Mot. for Summ. J. at ¶¶ 73-93).  There is no

indication that this case, involving Clarence Smith, was reported to the Chief of

Police.  Further, the case only involved a single incident that would not have notified

a municipal official of an emerging custom of performing strip searches.  (See id. ¶¶

66-68).  The Plaintiff is unable to show that his constitutional rights were violated

pursuant to a policy or custom of the City of Atlanta.  Accordingly, the Defendants'

motion for summary judgment should be granted with respect to the claims against

Defendant Reed and the City of Atlanta.[3]

Finally, it should be noted that the Plaintiff makes sweeping generalizations

about his evidence which are unsupported.  For example, the Plaintiff lumps together

many different types of searches which may or may not be illegal depending upon the

circumstances.  A search that is based upon probable cause or reasonable suspicion

---

[3]The Defendants filed a Motion to Strike Unauthenticated Documents Used by Plaintiff in Defense Against the Defendants' Motion for Summary Judgment [Doc. 55] arguing that the Plaintiff improperly relied upon informal and unauthenticated documents in his Statement of Additional Material Facts.  (See Defs.' Mot. to Strike Unauthenticated Documents, at 1).  The Defendants specifically move to strike Exhibits 1-16 attached to the Plaintiff's Statement of Additional Material Facts.  (See id.)  The Plaintiff cites these exhibits solely to support his assertion that the City of Atlanta had a policy or custom of performing strip searches.  (See Pl.'s Statement of Additional Material Facts in Opp'n to Defs' Mot. for Summ. J., ¶¶ 31, 78-93).  Because the Court concludes the Plaintiff has not shown the City of Atlanta had a custom or policy of performing strip searches, the Court will DENY as MOOT the Defendants' Motion to Strike Unauthenticated Documents Used by Plaintiff in Defense Against the Defendants' Motion for Summary Judgment [Doc. 55].

may be legal where the same search is illegal without probable cause or reasonable suspicion.  A visual inspection inside the underwear of  a suspect under arrest or in detention may be legal if made by pulling the underwear away for the body and shaking it.  Under the same circumstances, it may be illegal to pull down the suspect's pants and underwear and expose his genitals in public.  A strip search is not the same as a body cavity search.  The Plaintiff's arguments fail to take these distinctions into consideration.  Lumping together a variety of citizen complaints about searches does not in any way establish that the City of Atlanta had a policy or practice of performing illegal strip searches in February 2010.

> B.      Federal Claims Against the Officers

Defendants Pettis and Godwin (the "Defendant Officers") claim they have qualified immunity because they were acting within their discretion and did not violate the Plaintiff's constitutional rights.  Qualified immunity shields government officials executing discretionary responsibilities from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991), citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is a question of law to be decided by the Court. The test for qualified immunity is one of "objective-reasonableness" in evaluating the conduct of the

government official claiming its protection.  "[A]ll but the plainly incompetent or those who knowingly violate the law" find protection in qualified immunity.  Id., citing Malley v. Briggs, 475 U.S. 335, 341 (1986).

In Rich v. Dollar, 841 F.2d 1558 (11th Cir. 1988), the Eleventh Circuit adopted a two part analysis for assessing the qualified immunity defense.  First, the defendant public official must prove that he acted within the scope of his discretionary authority when the challenged conduct occurred.  If the defendant satisfies this part, the burden shifts to the plaintiff to show that the defendant public official's conduct violated clearly established law.  Id. at 1563-64.  In general, the Eleventh Circuit allows a broad and expansive scope of protection afforded by qualified immunity:

> That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities. . . Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.

Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (citations and footnotes omitted).  In Lassiter, the Eleventh Circuit expounded that for a law to be clearly established in the qualified immunity context, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise

a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." Id. at 1150 (emphasis in original).

The parties agree that Officers Pettis and Godwin were acting within the scope of their discretionary authority when the alleged strip search occurred. The Defendant Officers claim that the Plaintiff has not shown his constitutional rights were violated. Indeed, both Officer Pettis and Officer Godwin maintain that they were not at the West End Mall area on the day of the search. (See Pettis Decl. ¶ 3; Godwin Decl. ¶ 3). But the Plaintiff has provided contrary evidence. Clarence Brantley, who cut the Plaintiff's hair prior to the incident at issue, states that he witnessed Officers Godwin and Mayes stop, detain, and search the Plaintiff on February 17, 2010. (Brantley Decl. ¶¶ 2-7). Likewise, Shontavious Martin, a friend of the Plaintiff who accompanied the Plaintiff to the area on February 17, witnessed several officers strip search the Plaintiff and later identified Officers Pettis, Godwin, and Mayes as officers who participated in the search. (Martin Decl. ¶¶ 2-10). Additionally, Aquayetta Hill, the Plaintiff's girlfriend, witnessed Officers Godwin and Mayes search the Plaintiff. (Hill Decl. ¶¶ 2-13). While the Plaintiff could not name the officers that searched him in his deposition, he stated that he did not see the officers' name tags at the time, and, according to his declaration, he was able to later identify Officers Godwin, Mayes,

and Pettis as participants in the search based on photographs shown to him after he was deposed.  (See Sampson Dep. at 108-11; Sampson Decl. ¶¶ 4-6).

The Plaintiff's evidence is sufficient to create an issue of material fact sufficient to survive summary judgment.  While Officers Pettis and Godwin declare they were not at the West End Mall on the date in question, the Plaintiff has provided affidavits of three witnesses who contend they saw the officers search the Plaintiff on that day. (See Pettis Decl. ¶¶ 1-4; Godwin Decl. ¶¶ 1-4; Brantley Dec. ¶¶ 2-7; Martin Decl. ¶¶ 2-10; Hill Decl. ¶¶ 2-13).  Further, the declaration of Defendant Mayes indicates that the Red Dog Team comprised of Mayes, Pettis, Godwin, and Amarena answered a call in the West End Area on February 17, 2010, at approximately 5:45 p.m.  (Mayes Decl. ¶ 19).  According to the Plaintiff's evidence, Defendant Officers Pettis, Godwin, and Mayes collectively grabbed the Plaintiff when he was crossing the street after leaving the barber shop.[4]  (Sampson Decl. ¶¶ 3-4).  They held the Plaintiff and performed a

_____

[4]The Defendants contend that because the Plaintiff admits that Defendant Godwin remained a few feet away when the other Red Dog officers conducted the strip search, the Plaintiff's claims against Godwin must fail.  However, "[t]he law of this circuit is that 'an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'"  Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007) (quoting Skrtich v. Thornton, 280 F.3d 1295, 1302 (11th Cir. 2002)).  Although the Plaintiff's claim is stylized as "Unreasonable Search and Seizure Under the United States' Constitution," there is no indication that the same liability principles would not apply to his claim.  (See Compl. ¶¶ 41-55). Accordingly, the Court concludes that a reasonable jury could find that Defendant

strip search which included touching the Plaintiff's buttocks and genitals.  (See id.)
Witnesses state that the officers pulled the Plaintiff's pants down to his knees and
exposed his buttocks to the public.  (See Brantley Decl. ¶ 5; Martin Decl. ¶¶ 8-9; Hill
Decl. ¶ 9).  This evidence is sufficient for the Plaintiff to meet his burden and show
that a reasonable jury could conclude that the Defendants violated a constitutional
right that was clearly established at the time.  See Holloman ex rel. Harland, 370 F.3d
1252, 1267 (11th Cir. 2004) (discussing the plaintiff's burden at the summary
judgment stage with respect to qualified immunity).

In Richardson v. Quitman County, No. 4:11-cv-124, 2012 U.S. Dist. LEXIS
177776 (M.D. Ga. Dec. 17, 2012), the plaintiff argued that the strip search of her
person, in private, after she and her husband were pulled over based on reliable
information, was conducted outside the bounds of qualified immunity.  The court
noted a lack of precedent with respect to strip searches following the lawful seizure
of the suspect's vehicle, but noted that "any reasonable law enforcement officer would
understand that the constitutional requirements for such searches of a person who has
been arrested would apply at a minimum to a person who has not yet been arrested,"

--------

Godwin's presence at the scene of the strip search amounted to participation in the
strip search.

and proceeded to determine whether the strip search of the plaintiff violated those

minimum standards.  Id. at *39-40.  The court stated that:

> The Eleventh Circuit, in an *en banc* decision, stated that for a post-arrest
> strip/body cavity search, the law enforcement officer must have 'at least
> a reasonable suspicion' that the person to be searched possesses
> contraband and that the contraband is reasonably suspected to be located
> in the area to be searched.  Evans v. Stephens, 407 F.3d 1272, 1279-80
> (11th Cir. 2005) (en banc).  After this decision by the Eleventh Circuit,
> a reasonable officer would be on fair notice that in order to conduct the
> type of strip/body cavity search conducted here, he needed reasonable
> suspicion or else he would run afoul of the Fourth Amendment.

Id. at *40 (citing Evans v. Stephens, 407 F.3d 1272, 1279-80 (11th Cir. 2005)).  The

court concluded that, although the defendant police officers had reliable information

that the plaintiff and her husband were driving a vehicle containing illegal drugs and

may have had drugs on their persons, "a reasonable officer could not conclude that he

had reasonable suspicion that [the female plaintiff] possessed drugs in the areas under

her clothing that were searched."  Id. at *40-41.  The court bolstered its decision by

noting that the defendant officers had no information as to the female plaintiff's

specific role in the alleged unlawful activity and had no information that she had "any

history of hiding drugs in her body cavities covered by her clothing."  Id. at *41.

Here, the alleged search of the Plaintiff was not based on even reasonable

suspicion.  The Defendant Officers have provided no evidence suggesting they

suspected the Plaintiff possessed drugs or weapons.  Further, the Defendant Officers

have provided no evidence to indicate they suspected the Plaintiff was hiding drugs in his private areas.  Because the Defendant Officers have provided no evidence justifying their search of the Plaintiff, and because a reasonable law enforcement officer would be aware that he needed reasonable suspicion that a suspect held contraband in his private areas before strip searching him, the Court concludes the Plaintiff has demonstrated an issue of fact with respect to whether the Defendant Officers violated a clearly established constitutional right when they strip searched the Plaintiff.  Accordingly, the Defendants' motion for summary judgment should be denied with respect to the Defendant Officers' assertion of qualified immunity.

C.    State Law Claims Against Defendants Pettis and Godwin

1.    Official Immunity

The Defendant Officers contend they are protected by official immunity with respect to the state law claims against them.  Official immunity precludes hindsight review of an official's judgment and allows public employees to retain independence of action without fear of becoming personally liable.  Gilbert v. Richardson, 264 Ga. 744, 750 (1994).  A public officer may be personally liable for negligently performing ministerial acts.  However, under the doctrine of official immunity, an official is immune from liability for discretionary acts performed within the scope of his official

authority if the actions are done without wilfulness, malice, or corruption.  Cameron v. Lang, 274 Ga. 122, 123 (2001).

Actual malice, in the context of official immunity, is equated with "express malice or malice in fact" and requires a showing of "deliberate intention to do wrong." Adams v. Hazelwood, 271 Ga. 414, 415 (1999); Merrow v. Hawkins, 266 Ga. 390, 391 (1996).  Mere proof of ill will, anger, frustration, or irritation is insufficient to establish actual malice.  Adams, 271 Ga. at 415; Woodward v. Gray, 241 Ga. App. 847, 851 (2000).  Rather, "a 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs."  Murphy v. Bajjani, 282 Ga. 197, 203 (2007).

Here, the Plaintiff has created a genuine issue of material fact as to whether the Defendant Officers are entitled to official immunity.  The parties agree the Defendant Officers were performing a discretionary function when they allegedly strip searched the Plaintiff.  The Plaintiff claims that the strip search of his person was humiliating. (See Compl. ¶¶ 59, 62).  As noted, three witnesses describe seeing the officers strip search the Plaintiff.  (See  Brantley Decl. ¶ 5; Martin Decl. ¶¶ 8-9; Hill Decl. ¶ 9). This search was conducted at approximately five in the afternoon in a public parking lot near a mall.  (See Sampson Dep. at 91).  The police officers held the Plaintiff while they spread his buttocks apart and looked and then moved his genitals and testicles

and looked.  (See id. at 99-102).  As noted in the previous section, the Defendant Officers have provided no justification for conducting the strip search of the Plaintiff. Given this lack of justification, the Court concludes a reasonable jury could find that the Defendant Officers performed the strip search of the Plaintiff in order to humiliate him.  Accordingly, the Plaintiff has created an issue of fact with respect to official immunity and the Defendants' motion for summary judgment should be denied on those grounds.

2.    The Plaintiff's Claim for False Imprisonment

The Plaintiff claims that the alleged strip search amounted to false imprisonment.  O.C.G.A. § 51-7-20 defines false imprisonment as "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty."  Here, the Plaintiff has provided sufficient evidence to create an issue of fact as to whether the Defendant Officers falsely imprisoned him. According to the Plaintiff, he was physically restrained by several police officers while they searched his private areas.  (See Sampson Dep. at 98-103; Brantley Dec. ¶¶ 2-7; Martin Decl. ¶¶ 2-10; Hill Decl. ¶¶ 2-13).  The Defendants have not provided any contrary evidence aside from asserting they were not present at the time. Accordingly, the Court concludes a reasonable jury could find that the Plaintiff was

falsely imprisoned when the Defendant Officers strip searched him, and the Defendants' motion for summary judgment should be denied on those grounds.

        3.    <u>The Plaintiff's Claim for Battery</u>

The Plaintiff claims that the strip search of his person amounted to battery. "A cause of action for battery will lie for any unlawful touching, that is, a touching of the plaintiff's person, even if minimal, which ... would be ... offensive to an ordinary person not unduly sensitive as to his dignity." <u>Lawson v. Bloodsworth</u>, 313 Ga. App. 616, 618 (2012) (citing <u>Ellison v. Burger King Corp.</u>, 294 Ga. App. 814, 816-17 (2008)). The Plaintiff alleges the Defendant Officers restrained him while they conducted a strip search which included touching the Plaintiff's genitals and buttocks. (<u>See</u> Sampson Dep. at 98-103; Brantley Dec. ¶¶ 2-7; Martin Decl. ¶¶ 2-10; Hill Decl. ¶¶ 2-13)). Again, because the Defendants only assert they were not present, the Court concludes a reasonable jury could find that Defendant Pettis committed battery against the Plaintiff when they strip searched him. However, the Plaintiff admits that Defendant Godwin remained at the police vehicle and did not make any physical contact with the Plaintiff. (<u>See</u> Sampson Decl. ¶¶ 5-6) Because the tort of battery requires unlawful touching, and because Godwin did not touch the Plaintiff, the claim for battery against Defendant Godwin must be dismissed. Accordingly, the Defendants' motion for summary judgment with respect to the Plaintiff's claim for

battery should be denied with respect to Defendant Pettis but granted with respect to Defendant Godwin.

### 4.      The Plaintiff's Claim for Abuse in Being Arrested

The Plaintiff seeks recovery under the Georgia Constitution for "abuse in being arrested." The relevant section of the Georgia Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted; nor shall any person be abused in being arrested, while under arrest, or in prison." GA. CONST. Art. 1, § 1, ¶ XVII. In Long v. Jones, 208 Ga. App. 798, 800 (1993), the court noted that "Art. I, Sec. I, Par. XVII of the Georgia Constitution, which states that no person shall be abused while under arrest, provides an independent state ground for this action [alleging abuse for being held in chains for 22 days in jail], and provides at least as much protection to pre-trial detainees under the circumstances of this case as the Fourteenth Amendment due process clause." Although it is not clear if this provision has been applied to a seizure like the one in this case, the Defendants only argue that the Plaintiff's claim should fail because the Plaintiff admitted he was not in fact arrested. (See Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 16-17).

However, the test for whether a person was arrested or seized is not subjective. A person has been seized when, "in view of all the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave."

Jones v. State, 291 Ga. 35, 37 (2012) (quoting United States v. Mendenhall, 446 U.S.

544, 554 (1980)).  Likewise, "[a] person is seized by the police ... when the officer,

by means of physical force or show of authority, terminates or restrains his freedom

of movement, through means intentionally applied."   Id. (quoting Brendlin v.

California, 551 U.S. 249, 254 (2007)).  Here, the Plaintiff has provided evidence that

several APD officers restrained him and conducted a search of his private areas.

(See Sampson Dep. at 98-103; Brantley Dec. ¶¶ 2-7; Martin Decl. ¶¶ 2-10; Hill Decl.

¶¶ 2-13).  Despite Sampson's statement in his deposition that he was not actually

arrested, the Court holds that a jury could conclude that the APD officers intentionally

restrained the Plaintiff to an extent that a reasonable person would not have believed

he was free to leave.  (See Sampson Dep. at 124).  Accordingly, the Defendants'

motion for summary judgment should be denied with respect to the Plaintiff's claim

for abuse in being arrested.

5.   The Plaintiff's Claims for Punitive Damages and Bad Faith Fees and Expenses

The Defendants argue in their motion for summary judgment that the Plaintiff's

punitive damages claim and bad faith fees and expenses pursuant to O.C.G.A § 13-6-

11 claim should be dismissed because the underlying state law claims lack merit.  (See

Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 16-17).  However, the Court has

concluded that the Plaintiff's state law tort claims should survive summary judgment. Accordingly, the Defendants' motion for summary judgment should be denied with respect to the punitive damages claim and the claim for bad faith fees and expenses.

## IV.  Conclusion

For the reasons set forth above, the Defendants Kasim Reed, Robert Godwin, and Reginald Pettis's Motion for Summary Judgment [Doc. 37] is GRANTED in PART and DENIED in PART and the Defendants Kasim Reed, Robert Godwin, and Reginald Pettis's Motion to Strike Unauthenticated Documents Used by Plaintiff in Defense Against Defendants' Motion for Summary Judgment [Doc. 55] is DENIED as MOOT.

SO ORDERED, this 28 day of March, 2013.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge